UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SONIA ORTEGA,
    *Plaintiff*,

v.

COURTNEY E. MORAN,
    *Defendant*.

No. 3:21-cv-485 (JAM)

**MEMORANDUM OF DECISION**

The plaintiff Sonia Ortega claims that the defendant Courtney Moran used excessive force against her in violation of Ortega's constitutional rights under the Fourth and Fourteenth Amendments. I previously denied Moran's motion for summary judgment. *See Ortega v. Moran*, 2022 WL 17092584 (D. Conn. 2022). Following a bench trial, I now conclude that Ortega has failed to carry her burden to prove that Moran used excessive force.

**BACKGROUND**

This case arises from an encounter between Ortega and Moran on August 16, 2018 at a state courthouse in Bridgeport, Connecticut. Ortega was there that day with other family members to watch the criminal sentencing of her son. Moran was on duty as a state judicial marshal. In this section of the ruling, I will review the witness testimony before later addressing the extent to which I find the testimony to be persuasive.

Ortega testified that, while attending her son's sentencing in Courtroom 3B, she was "kicked out of the courtroom."[1] She did not know why she was being removed from the courtroom.[2] Moran told her that "I needed to come out," and then she "re[st]rained me, grabbed

---

[1] Doc. #46 at 7.
[2] *Id.* at 8, 12.

1

me, and then she was dragging me to the elevator." [3] Moran "had me through my arm," and "[t]hat's where the bruises came from."[4] Ortega further testified that Moran "practically dragged me from where I was," from "the beginning all the way, the elevator, down," and that "[i]t all happened outside in front of the courtroom."[5]

According to Ortega, she did not do anything to provoke Moran.[6] "All I was doing was trying to explain to her that I wanted to be there for my son. I didn't understand what was going on."[7]

Ortega further testified that when they were in the lobby, her daughter told Moran to "Let go of my mom," before pulling out her cellphone to take a video of what was happening.[8] At that point "the officers came in" and "that's when they all came and attacked me."[9] "She brought the phone, Ms. Moran grabbed the phone, and I got in the middle. And that's when everything happened."[10] According to Ortega, "[w]hen the attack happened is when the cell phone came up and [Moran] went to go grab my daughter."[11]

Ortega denied touching Moran despite trying to put herself in between Moran and her daughter.[12] Ortega testified that "I had injuries to my head. I had injuries in my hands. I had injuries everywhere. I have pictures of it."[13] She testified that "I was crying the whole time,"

---

[3] *Id.* at 7-8.
[4] *Id.* at 9.
[5] *Ibid.*
[6] *Ibid*.
[7] *Id.* at 10.
[8] *Id.* at 17.
[9] *Id.* at 8.
[10] *Id.* at 25.
[11] *Id.* at 26; *see also id.* at 39-40.
[12] *Id.* at 27-28, 40-41.
[13] *Id.* at 10.

because "I was very upset at the fact that my son was being sentenced" and "the fact that I was being apprehended for I have no idea what reason."[14]

Moran testified next, offering an account very different from Ortega's. According to Moran, she was summoned to Courtroom 3B because "there was a disruption" and the judge "wanted individuals escorted out."[15] Moran and other marshals asked three people to leave the courtroom; these individuals "continued to scream and yell" even after they were outside 3B.[16]

Because of this continued disruption, Moran "escorted" the individuals "out of the building," first by taking them to the elevator and then through the main lobby of the courthouse.[17] She testified that "I do not recall grabbing anybody [while] escorting out of the building," and clarified that "escorting" meant "shepherding" the individuals out by walking behind them with hands extended laterally to guide them in the right direction.[18]

According to Moran, when she was in the lobby of the building, there was continued "berating" and "yelling," and Ortega's daughter then pulled out a cellphone to video what was happening.[19] Both Moran and another judicial marshal put up their hands and announced "no cell phones."[20] "That's when Mrs. Ortega's hand came over and I got scratched in the face."[21] This prompted another judicial marshal to call for back-up, and Ortega was placed under arrest.[22]

The last trial witness was Connecticut State Trooper Chris Peyton, who testified about statements Ortega made at the scene after she was placed under arrest. Trooper Peyton testified

---

[14] *Id.* at 17-18.
[15] *Id.* at 44.
[16] *Id.* at 45.
[17] *Id.* at 45-47.
[18] *Id.* at 46. At the trial I recall Moran demonstrating how she laterally extended her hands with palms open at her waist to escort a person in a desired direction.
[19] *Id.* at 48. Although Moran did not describe what Ortega's daughter was doing with her cell phone, Ortega testified that "my daughter was trying to video." *Id.* at 16.
[20] *Ibid.*
[21] *Ibid.*
[22] *Ibid.*

that Ortega did not complain of any injuries.[23] Trooper Peyton also testified that Ortega told him that "she had accidentally hit Marshal Moran while attempting to stop her daughter from taking a photo."[24]

### FINDINGS OF FACT

After considering the testimony of all the witnesses, I credit the accounts of Moran and Trooper Peyton to the extent that they conflict with the account of Ortega. As an initial matter, Ortega was not a generally credible witness. Her testimony was disjointed, and she had difficulty coherently describing where the events at issue occurred—whether inside the courtroom, just outside the courtroom, in the lobby, or outside the courthouse.[25] She testified that "I cannot remember a lot of things . . . because I had a lot going on."[26]

Moreover, Ortega's testimony that she was ordered for no reason at all to be removed from the courtroom is not plausible. Instead, I am convinced by Moran's contrary testimony that Ortega and others caused a disturbance at the sentencing that led to the efforts of Moran and other judicial marshals to first remove them from the courtroom and, ultimately, to seek to remove them from the courthouse after the screaming and yelling continued.

I also credit Moran's account that she escorted Ortega from the courtroom and towards the exit of the courthouse without applying physical force. Although Ortega testified that Moran grabbed and dragged her, leaving bruises of which she had pictures, she did not introduce any photographs or any evidence at all to corroborate her claim. Nor did she report to Trooper Peyton in her post-arrest statement that she had suffered injuries.

---

[23] *Id.* at 61, 68.
[24] *Id.* at 67-68.
[25] *Id.* at 8-23, 34-39.
[26] *Id.* at 23.

I also conclude that, after Moran tried to prevent Ortega's daughter from using a cellphone in the lobby of the building, Ortega struck Moran in the face, which caused Moran and other marshals to place Ortega under immediate arrest. Ortega's denial at trial that she made any physical contact with Moran was contradicted by her post-arrest statement to Trooper Peyton that she accidentally struck Moran.

## CONCLUSIONS OF LAW

The Fourth Amendment—as applicable to state officers like Moran under the Fourteenth Amendment—protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. It has long been recognized that a law enforcement officer violates the Fourth Amendment by using excessive force against a free person for the purpose of arresting or restraining his or her freedom of movement. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 388 (1989).

Whether an officer's use of force is "excessive" must be judged by "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. A court must give "careful attention to the facts and circumstances of each particular case," including (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Moreover, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ibid.* Thus, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

5

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97; *see also Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (same).

A similar standard applies to a claim under the Fourteenth Amendment that may arise outside the Fourth Amendment arrest context and where law enforcement officers take coercive steps to maintain general public order. *See Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (considering Fourteenth Amendment excessive force claim in context of police use of a long range acoustic device to disperse protesters). A plaintiff must show that the force used was objectively unreasonable, and—among other factors—courts may consider "'the relationship between the need for the use of force and the amount of force used,'" as well as "'the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Id.* at 534 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

In light of my factual findings above, I conclude that Ortega did not prove by a preponderance of the evidence that Moran used excessive force against Ortega at any time during their interactions at the Bridgeport courthouse. I will first consider Ortega's claim that she was subject to excessive force prior to her arrest before considering whether she was subject to excessive force during her arrest.

Prior to Ortega's arrest, Moran did not use any physical force at all. Instead, Ortega and the other marshals guided Ortega by means of verbal commands and body positioning to depart the courtroom, to go down the elevator, and to enter the lobby of the courthouse. If there was any incidental physical contact in the course of this shepherding, it was not excessive or more than

the circumstances reasonably required in light of the continuing disruptive behavior. It was objectively reasonable for Moran in her capacity as a state judicial marshal to clear the courtroom of disruptive spectators in response to a judge's order and then to try to clear these spectators from the courthouse after they continued to be disruptive.

After Moran and another marshal tried to stop Ortega's daughter from using her cellphone, Ortega struck Moran in the face. Whether or not this striking was accidental, it was objectively reasonable under all the circumstances for Moran and the other marshals to respond by immediately securing and arresting Ortega as they did. Although Ortega claimed that she was attacked by the marshals and suffered injuries, she produced no evidence at trial of these injuries, nor did she tell Trooper Peyton at the time that Moran or any other judicial marshal had injured her.[27] Accordingly, Moran did not use excessive force in the course of securing and placing Ortega under arrest.

All in all, Ortega's evidence falls short of proving that Moran used excessive force. In light of my conclusion that Ortega has failed to carry her burden to show a violation of the Fourth or Fourteenth Amendments, I need not further address Moran's argument that she is entitled to qualified immunity. Accordingly, I will enter judgment in Moran's favor.

## CONCLUSION

On the basis of all of the evidence and arguments, I conclude that plaintiff Sonia Ortega has failed to prove by a preponderance of the evidence that defendant Courtney Moran should be

---

[27] To be sure, a claim for excessive force does not elementally require proof of a physical injury, *see Jackson on Behalf of Z.J. v. City of Middletown*, 2017 WL 2218304, at *3-5 (D. Conn. 2017), but the absence of injury may be circumstantial evidence that there was no excessive force used in the first instance.

liable to her for the use of excessive force in violation of the Fourth and Fourteenth Amendments. The Clerk of Court shall enter judgment in defendant's favor and close this case.

It is so ordered.

Dated at New Haven this 2nd day of January 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge